**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|   |   |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 19-20044-JAR** |
| **BRUCE L. HAY,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Before the Court is Defendant Bruce Hay's Motion for Judgment of Acquittal (Doc. 99), filed at the close of the Government's evidence. The Government filed a Response,[1] and Hay orally renewed his motion at the close of all the evidence. In his motion, Defendant Hay generally argues that the Government failed to present sufficient evidence to support convictions for wire fraud or theft of government funds. Hay also argues that the theft-of-government-funds statute, 18 U.S.C. § 641, does not encompass conversion or stealing by fraud. The Court took the motions under advisement, and on August 11, 2022, the jury rendered its verdict, finding Hay guilty of all sixteen counts of the Superseding Indictment.[2] As described more fully below, the Court denies Defendant's motion for judgment of acquittal.

## I.      Evidentiary Background

Viewing the evidence in the light most favorable to the Government, as the Court must, a rational jury could find that the evidence and stipulations presented at trial proved the following beyond a reasonable doubt.

---

[1] Doc. 100.

[2] Doc. 110.

Defendant Bruce Hay is a veteran of the United States Army, serving three stints, from 1987 to 1991, 1996 to 1998, and 2003 to 2006.   In 2006, Hay received a medical discharge following a 2005 car accident which he complained caused him tremors and difficulty walking. In 2005, Hay was evaluated by neurologists for complaints of muscle spasms, tremors, involuntary seizure-like episodes, and his claimed inability to drive or work.  After evaluating MRIs and EEGs, these neurologists, and later other treatment providers, determined that Hay was suffering from conversion disorder.  Conversion disorder's genesis is a psychological problem that manifests in some other way, often with neurological symptoms.  It presents with one or more motor and sensory symptoms that are not consistent with a neurological or medical condition but that nonetheless severely impair one's occupational or social functioning.  There are no diagnostic tests for conversion disorder; it is a diagnosis of exclusion.  Some people with conversion disorder cannot work.  Some cannot drive, given that the symptoms may include seizure-like episodes, spasms, shaking, tremors, and involuntary body movements that are unplanned and unpredictable.  Nonetheless, Dr. Kathryn Hodges, a neurologist who treated Hay in 2006, expected that he would improve.  She ordered him to continue with physical therapy, but Hay stopped physical therapy after two months.  And Hay did not return to this neurologist for any follow-up visits.

On February 28, 2006, Hay submitted a claim for compensation to the Veterans Administration ("VA"), reporting the following disabilities: wrist fusion, conversion disorder post head injury with tremors, post-traumatic stress disorder ("PTSD"), chronic urticaria, hearing loss, hypothyroidism, irritable bowel syndrome, and shortness of breath.  As part of the claims process, the VA conducted Compensation and Pension ("C&P") benefits examinations of Hay in September 2006, and periodic C&P examinations thereafter.  At these C&P examinations, Hay

reported that he had full-body tremors on a daily basis and that he could only ambulate with the assistance of a walker.  He reported that he could not work, drive, or even engage in leisure activities.  And at these examinations he presented as someone unable to walk without a walker; he displayed a spastic gait, tremors, and impaired balance.  Hay also told C&P examiners that he was unable to perform some activities of daily living ("ADLs") such as dressing and toileting without assistance from his wife and family.

On March 8, 2007, the VA issued a rating decision that Hay had 100% service-connected disabilities for conversion disorder and psychomotor abnormal tremors or body movements, effective March 1, 2006.[3]  The VA also determined that Hay was entitled to additional Aid and Attendance benefits to pay for someone to assist him with ADLs.  Because the VA did not determine that Hay's disabilities were total and permanent, he was required to undergo periodic C&P examinations by the VA.  During this time period Hay also successfully submitted a claim to the Social Security Administration ("SSA") and received disability benefits.

In August 2007, the VA required Hay to undergo an updated C&P examination.  At this examination, Hay reported that he was experiencing frequent falls, an inability to grasp, constant involuntary upper body movements, that he was unable to drive, needed a cane or walker to ambulate, needed help dressing, and that it took him a long time to eat because of his constant tremors.

From 2008 to 2012, Dr. Emmett McWoods, a VA physician, treated Hay, seeing him once or twice a year.  Hay consistently reported to Dr. McWoods that his symptoms and impairments continued.  And Hay consistently presented as someone who had difficulty walking without the assistance of a cane or walker.

---

[3] The VA determined he had various ratings less than 100% for other conditions not at issue in this case.

On April 3, 2012, Hay submitted a claim to the VA for total and permanent disability. Based on his clinical observations of Hay since 2008, and largely relying on Hay's reports of his symptoms and impairments Dr. McWoods authored a letter at Hay's request supporting Hay's claim for total and permanent disability benefits from the VA.  Dr. McWoods' letter stated that Hay's condition would never improve.  After conducting additional C&P examinations, on April 20, 2013, the VA granted Hay's application for total and permanent disability for conversion disorder and choreiform movement disorder.  This meant that Hay did not have to undergo any further periodic C&P examinations.  And it also made Hay eligible for additional benefits, including educational benefits for his spouse and dependent children.

In 2011, the Inspector General offices of the VA and SSA had received anonymous complaints that Hay was able to perform physical labor inconsistent with his claims of disability. These anonymous complainants reported that Hay was lifting heavy hay bales, doing construction work on his family farm and frequently driving tractors and trucks.

The VA and SSA initiated an investigation in 2012.  At that point their investigation focused on surveilling Hay as he arrived at and departed from medical and C&P examination appointments at the VA.  On at least one occasion, agents began their surveillance by watching Hay depart from his house.  On November 28, 2012, agents had an hour-long interaction with Hay, under the guise that they were investigating deer poaching.  They talked to Hay and surreptitiously video-recorded Hay's movements and demeanor during that interaction.  What they observed and recorded belied Hay's claims of disability.  Hay displayed no tremors, no difficulty walking as he stepped down into a ditch and walked on unpaved ground, and, though he had a walking stick, he did not use it to ambulate, but occasionally gestured or pointed with it. Hay told the agents that he was an avid deer hunter.  He described his deer stand as one that he

pulled up into the tree after he climbed steps that he screwed into the tree trunk.  He even described pulling his obese hunting partner up into the deer stand.  Hay presented as someone with well-formed musculature as well.

For various reasons, the investigation stalled until 2016.  In 2016, agents installed a pole camera on a public building across the street from Hay's house.  For an eight-week period in November and December 2016, a one-week period in March 2017, and a one-week period in May 2017, the pole camera video recorded Hay's activities on his front porch, front yard, and driveway.

A rational jury could find that Dr. McWoods and other medical and claims professionals at the VA were fooled by Hay's verbal reports and non-verbal displays of his symptoms and impairments during appointments from 2008–2017.  Agents testified to their surveillance and showed video-recordings of some of their surveillance of Hay arriving at and departing from the VA Medical Center and Dr. McWoods' office.  They also showed videos recorded inside the VA halls and lobby in which Hay used a walker and displayed spastic head and body movements.  There were audio and video recordings of two C&P examinations in May 2017, which allowed the jury to see how Hay presented and hear what Hay reported to the C&P examiners.  And Dr. McWoods and the many medical professionals who testified described similar reports by Hay of symptoms and impairments and described similar clinical observations of Hay's displays of such.

But these medical and claims professionals were not privy to the extensive surveillance, video-recordings, testimony of percipient witnesses, and other evidence collected by agents and admitted for the jury's consideration at trial.  When shown the video-recordings of Hay's activities and movements outside of his house and at other locations, Dr. McWoods testified that

he would never have supported Hay's disability claim had he been privy to these recordings, which depicted that Hay could easily ambulate without assistance and with movements that were fluid, not spastic.

The evidence included the pole camera footage and the agents' video-recordings and testimony about their observations of Hay in front of his house, at the VA, at commercial establishments, and in other places in the community. The jury also heard testimony from Hay's sister and neighbors, who, unbeknownst to law enforcement, were also video-recording Hay's activities. The jury heard testimony from other people in the community who interacted with Hay and had personal knowledge that his activities belied his claims of disability. And Hay made written and oral statements to other people and other government agencies that were inconsistent with his claimed symptoms and impairments. This evidence allowed the jury to compare what Hay was representing to the VA with Hay's behavior in other places and contexts, as further detailed below.

In February 2006, Hay applied for disability compensation from the VA and in September 2006, Hay underwent C&P examinations, claiming he could not walk, work, drive, or engage in ADLs without assistance. But the jury heard testimony and saw photographs of Hay constructing a 4,000 square-foot, two-story house in the spring and summer of 2006. The photographs depicted Hay standing on high ladders, installing the main water line, putting up roof trusses, using power tools, lifting heavy windows and balancing himself on scaffolding on the second story of the house. At a C&P examination in August 2007, Hay continued to claim that he was unable to even attend to his ADLs without assistance. Yet in 2006 and 2007, Hay applied for and received Kansas Unemployment Compensation benefits, attesting that he was

ready, willing and able to work.  Hay's sister, Stacy Macomb, testified that Hay put up heavy

bales of hay on the family farm every year from 2005 to 2015.

Rhonda and Bert Snyder were neighbors of the Hay family farm.  They testified that they

saw Hay continually do physical labor on the farm.  They had never seen him with a walker, but

noticed that he usually carried a cane in public places and that if he saw a car approaching the

farm, he would grab his cane before the car arrived.  The Snyders testified that in 2010 they

observed Hay single-handedly loading, stacking and hauling 50- to 70-pound bales of hay,

hauling junk to the farm and leaving with an empty trailer (evidencing he had unloaded the

junk), and building a 50-yard-long fence.   The Snyders surreptitiously video-recorded Hay's

activities on two occasions.  On the first occasion, Hay stood on the bed of a moving hay truck

and threw bales of hay.  On the second occasion, Hay appeared to be assisting a group that had

come to the farm to hunt or shoot; Hay was laying out the guns, bending, squatting and not using

a cane.  Hay's proximity to shooting was inconsistent with his telling VA personnel that he

avoided loud noises because it triggered his PTSD and conversion disorder symptoms.

During this time period that the Snyders were video recording and photographing Hay's

activities on the farm, Hay continued to tell Dr. McWoods and others that his symptoms and

impairments continued.  Yet in 2009 and 2010, Hay was receiving farm subsidy payments after

he represented to the United States Department of Agriculture that he was the sole operator of

the Hay family farm and that he performed 100% of the farm labor.

Notably, in 2015, Hay and his mother entered into an employment agreement that stated

the Hay family farm owed Hay $62,000 a year for his labor on the farm.  Hay attached this

employment agreement to a mechanic's lien he filed in 2021, claiming that he was owed $62,000

a year from January 1, 1985 to December 31, 2020 for labor he had performed as the "Farm

Manager," which included equipment repair, livestock management, fence repair and other property upkeep, crop planting and harvesting, and hay harvesting.

In March 2012, a trade publication article quoted Hay and depicted him as he attended a farm workshop for his stated purpose of improving his farming operation. The photographs evidence that Hay toured the farmland on foot without the need of a walker and while carrying but not using his cane. In 2012, Hay told a Miami County deputy sheriff who was investigating a cow-motorcycle collision that Hay had fixed or replaced about three miles of fence on his property. Yet one month later, in April 2012, Hay convinced Dr. McWoods to support his claim for total and permanent disability.

In the fall of 2012, the VA required Hay to undergo updated C&P examinations in connection with his claim for total and permanent disability. Hay reported and displayed for these examiners that his symptoms and impairments continued without improvement. Agents video-recorded Hay as he arrived and departed these VA appointments. For example, on October 29, 2012, agents surveilled Hay working on his truck in front of his house and walking without any apparent difficulty or use of an assistive device until he arrived at the VA facility that day for his appointment with Dr. McWoods. Then Hay displayed the difficulty walking and other symptoms he typically demonstrated when he had an appointment with Dr. McWoods. After Hay and his wife drove home that day, Hay drove himself to his family farm where he was seen throwing a large bale of hay into the bed of a truck, jumping onto the bed of the truck and standing on the bed of the moving truck as it traveled through a pasture off-road.

And on November 19, 2012, Hay displayed great difficulty walking and unsteadiness on his feet, almost falling in the parking lot outside of the doctor's office. But minutes after the appointment Hay's wife drove them to a pawn shop, where Hay went inside unassisted and

without any difficulty.  After a short time in the pawn shop, and a short visit to another business, Hay's wife drove them home.  Later that day, Hay left their home, driving alone.  Nine days later, on November 28, 2012, agents had the aforementioned hour-long conversation with Hay about deer poaching.  And while his claim for total and permanent disability was pending, on March 18, 2013, Hay had another C&P examination, again displaying difficulty walking, spasms, head movements, hyper extension of his arms and hands; and reporting that he needed help with toileting, bathing, and dressing.

Hay had a dentist appointment at the VA in March 2017.  His dentist testified that at times she had seen him have an unusual, unsteady gait, walking with a cane, but never a walker. His dentist further testified that she began treating him in December 2014 and he never warned her that he might have tremors, head jerking, or involuntary movements.  She testified that this would have been important information for her to know before working in his mouth, particularly before a two-hour dental procedure she performed.  In the dentist's waiting room during that March 2017 visit, Hay told an undercover officer that he worked with his brother-in-law doing remodeling, and offered to help him get a job there.

In May 2017, the VA required Hay to undergo updated C&P examinations despite its earlier determination that his disability was total and permanent.  Pole camera footage showed that the day before his two C&P examinations that month, Hay moved heavy tent canopies onto his truck and worked on his truck's engine, alone and without assistance. But the next day, Hay arrived at the VA for the two C&P examinations, using a walker that he had been seen loading into the truck at home earlier that day.  Hay displayed great difficulty walking, with marked head bobbing.  The C&P examinations were audio- and video-recorded.  Hay mumbled and displayed difficulty answering the examiners' questions.  Hay reported that he had not worked since 2006

and that someone else did the labor on his family farm.  He reported that weekly he had whole body tremors and seizure-like symptoms, with severe episodes once or twice a month that lasted for two or more hours.  Hay's wife added that the episodes were random with no prior warning.  The Hays described the episodes as causing all of his muscles to contract and that he was unable to move except for shaking.[4]  During the two C&P examinations, Hay displayed head shaking, groaning, tremors, and arm stiffness.  He reported that his wife sometimes had to help him with bathing, dressing, and toileting.  He reported that he was unable to shop; he would sit on a bench and wait for his wife while she shopped.  Shortly after leaving that appointment, Hay's activities belied his statements.

Immediately after these two C&P examinations, Hay again displayed difficulty walking with his walker in the VA parking lot; yet he easily bent down to pick up coins that agents had left on the ground near Hay's truck.  He also loaded the walker into the truck by himself.  Hay's wife then drove them to Sam's Club, 20–25 minutes away, where agents surveilled and store video footage evidenced Hay shopping.  He walked around the large store without the walker and without assistance or difficulty, loading boxes of groceries into the truck and quickly grabbing a runaway shopping cart.  Though Hay had the cane with him, he did not rely on it.  Rather he was seen swinging the cane, dragging it on the ground and at times he kept the cane inside the grocery cart.  The Hays then drove home.

The pole camera footage of Hay's activities in front of his house in late 2016, March 2017, and May 2017, allowed the jury to see Hay's movements and conduct to which the VA personnel were not privy.  The pole camera showed Hay in front of his house almost daily.  At

---

[4] He also told the psychologist examiner that he could not get along with people, that he isolated and that he hated everyone.  But the jury heard from multiple witnesses that during this period Hay led a committee at church and engaged in other social activities.

various times he moved, lifted, and stacked large boxes and obviously heavy items.  At times he appeared to be working on his truck engine.  Once he was seen attaching a trailer to his truck. He was seen hopping up and down the front porch steps and running or jogging across the yard or driveway.  He was never seen with a walker, except when he carried and loaded the walker into his truck on the way to a VA appointment.  At times he was seen with the cane, but never using it for assistance with ambulating. On several occasions he carried a baby in a baby carrier despite his wife being present; they were both apparently unconcerned about Hay potentially injuring the baby should he have a sudden tremor, involuntary movement, or loss of balance.  On one occasion Hay was seen kicking the door of his truck closed; once he stood and balanced on one foot to clean the sole of his boot, with no difficulty.

Others testified about their observations of Hay's activities in 2016 and 2017.  In 2016, agents surveilled Hay at a festival; for three hours he displayed none of the claimed symptoms and impairments.  Osawatomie Deputy Chief of Police testified that he saw Hay moving a loveseat during a yard sale in 2016.

In September 2021, Hay was still engaging in physical labor inconsistent with his claims of disability.  Macomb testified about photographs she took that month of Hay standing on a roof, throwing planks of wood and debris from a house fire onto the ground.  And Wes Ungeheuer, a scrap metal dealer, testified that Hay had been hauling and selling scrap to him for over fifteen years.  Ungeheuer presented a spreadsheet of his transactions with Hay from 2017 to 2022 evidencing that he had paid Hay over $162,000 for over one million pounds of scrap Hay hauled to his yard during those five years.  Ungeheuer testified he had seen Hay with a cane occasionally but never with a walker and that Hay had told him Hay obtained some scrap by collecting it from curbside.

In August 2018, the VA terminated Hay's disability benefits for choreiform movement disorder and conversion disorder.[5]

## II.    Discussion

Fed. R. Crim. P. 29 allows a defendant to move for a judgment of acquittal at the close of the Government's evidence.[6]  The Court may reserve decision on the defendant's motion and proceed with trial, submit the case to the jury, and then decide the motion for acquittal before the jury reaches a verdict or after the jury returns a guilty verdict.[7]  Rule 29(c) provides that a defendant may also move for a judgment of acquittal or renew a previous motion for acquittal within fourteen days after the jury returns a guilty verdict or is discharged.[8]

The Court must consider the sufficiency of the evidence in the light most favorable to the Government and determine "whether any rational trier of fact could have found, from the direct and circumstantial evidence presented to it, together with the reasonable inferences therefrom, the essential elements of the crime beyond a reasonable doubt."[9]

### A.    Wire Fraud

Hay was charged in Counts 1–6 of the Superseding Indictment with wire fraud under 18 U.S.C. §§ 1343 and 2 for devising a scheme to defraud the VA of disability payments that were paid electronically, through ACH payments initiated by the VA in Illinois and transmitted to Hay's bank account in Kansas as follows: Count 1 for a $3,990.24 payment on June 30, 2017;

---

[5] The Presentence Investigation Report (Doc. 116) includes the  Government's calculation of losses to the VA as: $422,572.66 for disability benefits from 2013 to 2017 to which Hay was not entitled, $69,704.95 in caregiver benefits paid to his wife, and $115,343.21 in dependent educational benefits paid to his children, for a total of $607,620.82 in VA benefits to which Hay was not entitled.  The Government calculates that the total loss to SSA and VA was $760,741.82.  *Id.* at 10–12.

[6] Fed. R. Crim. P. 29(a).

[7] Fed. R. Crim. P. 29(b).

[8] Fed. R. Crim. P. 29(c)(1).

[9] *United States v. McIntosh*, 124 F.3d 1330, 1334 (10th Cir. 1997) (citations omitted).

Count 2 for a $3,990.24 payment on August 1, 2017; Count 3 for a $3,990.24 payment on

September 1, 2017; Count 4 for a $4,070.05 payment on March 1, 2018; Count 5 for a $4,070.05

payment on May 1, 2018; and Count 6 for a $4,070.05 payment on August 1, 2018.[10]  Hay was

convicted of all six wire fraud counts.

To convict Hay of wire fraud, the Government must prove the following elements beyond

a reasonable doubt: (1) that Hay devised or intended to devise a scheme to defraud, as alleged in

the Superseding Indictment; (2) that Hay acted with specific intent to defraud; (3) that Hay used

interstate or foreign wire communications facilities for the purpose of carrying out the scheme;

and (4) the scheme employed false or fraudulent pretenses, representations or promises that were

material.[11]  Hay generally argues that the Government failed to prove each element beyond a

reasonable doubt.

The parties filed a Joint Stipulation that these payment transactions flowed in interstate

commerce, such that the third element of wire fraud was not disputed.[12]  And, when viewing the

evidence in the light most favorable to the Government, a rational jury could find that the

Government proved the other three elements of wire fraud beyond a reasonable doubt.  The

evidence proved that Hay devised a scheme to obtain disability and disability-related benefits

from the VA by repeatedly falsely representing to the VA that he was unable to work and often

unable to drive or engage in ADLs.  Hay made false representations, both verbal and non-verbal,

to VA medical and claims personnel about the nature, extent, and duration of his symptoms,

impairments, and resulting disability.  These false verbal representations and nonverbal pretenses

were material to the VA.  Dr. McWoods relied upon Hay's false representations and pretenses in

---

[10] Doc. 68 at 7.

[11] *See, e.g.*, *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) (citations omitted).

[12] Doc. 83.

supporting Hay's application for total and permanent disability benefits.  Other VA personnel relied upon Hay's false representations and pretenses in awarding and continuing to award him benefits, including Aid and Attendance, and total and permanent disability.

A rational jury could find from circumstantial evidence and reasonable inferences, that Hay specifically intended to defraud the VA, through false verbal representations and false non-verbal pretenses.  Hay's movements and behavior was surveilled and at times recorded in various locations by agents, neighbors and Hay's sister.  The jury heard evidence suggesting that at the VA or medical appointments, Hay put on a display of severe spastic movements and difficulty ambulating.  Minutes after the appointments, in other locations, Hay was seen ambulating fluidly and without assistance.  In other public settings Hay also ambulated well and displayed no impairments or symptoms.  At Sam's Club, at the scrapyard, at the family farm, or in interacting with local law enforcement or agents who claimed to be investigating deer poaching, Hay displayed no difficulty ambulating, nor any other symptoms.  While Hay usually carried his cane in public, the cane appeared to be used as a prop, not as an assistive device.  Hay frequently drove without assistance despite his claims of sudden, unwarned, seizure-like episodes.

And in front of his home and on his family farm, where a jury could infer Hay believed he was out of the public eye, Hay engaged in heavy farm labor, scrap hauling, truck mechanics, moving and loading heavy objects.  Hay displayed none of the symptoms or impairments he consistently reported to the VA from 2006 to 2018.

### B.      Theft of Government Property

Hay was charged in Counts 7–16 of the Superseding Indictment with theft of government funds exceeding $1,000, in the form of disability and other monetary compensation paid by the VA to which he was not entitled, in violation of 18 U.S.C. §§ 641 and 2, as follows: Count 7 for

a $2,827.18 payment on September 30, 2016;  Count 8 for a $2,827.18 payment on November 1,

2016; Count 9 for a $2,971.60 payment on March 31, 2017; Count 10 for a $2,971.60 payment

on May 1, 2017; Count 11 for a $2,971.60 payment on June 30, 2017; Count 12 for a $2,971.60

payment on August 1, 2017; Count 13 for a $2,971.60 payment on September 1, 2017; Count 14

for a $3,030.64 payment on March 1, 2018, Count 15 for a $3,030.64 payment on May 1, 2018;

and Count 16 for a $3030.64 payment on August 1, 2018.[13]  Hay was convicted on all ten counts.

     To convict Hay of theft of government property under 18 U.S.C. § 641, the Government

must prove the following three elements beyond a reasonable doubt: (1) that the disability or

other monetary compensation belonged to the United States government, namely the VA; (2) that

he stole, embezzled, or converted the disability or other monetary compensation intending to put

it to his own use or gain, or that he took the property knowing it was not his and intending to

deprive the owner of the use or benefit of the property; and (3) that the value of the disability or

other monetary compensation was more than $1,000.[14]  Hay generally argues that the

Government failed to prove each element beyond a reasonable doubt, and specifically argues that

the Government failed to prove that he violated 18 U.S.C. § 641 because fraud is not actionable

under § 641.

     First, with respect to Hay's general factual challenge to his convictions under § 641, the

Court easily concludes that a rational jury could find that Hay received disability or other

monetary compensation belonging to the VA and that its value was more than $1,000.  The Court

easily concludes that a rational jury could find that Hay received this money intending to deprive

the VA of the funds, for his own gain.  Hay did this in the same manner and means that the Court

---

[13] Doc. 68 at 8.

[14] *See* 18 U.S.C. § 641; *United States v. McPhilomy*, 270 F.3d 1302, 1307–08 (10th Cir. 2001).

described on the wire fraud convictions, through false and fraudulent representations and pretenses, through verbal statements and non-verbal representations to VA personnel.

Hay argues more specifically that fraud is not actionable under § 641 and thus the Government failed to prove he violated that statute.[15]  Hay argues that § 641 expressly states the means by which the offense may be committed: embezzlement, stealing, purloining, and conversion but the plain language does not include conversion or stealing by fraud.

Hay further argues that this reading of the statute is consistent with congressional intent, as demonstrated by Congress omitting the word "fraud" in § 641, but including the words "steal" and "fraud" in other statutes found in Chapter 31 of Title 18, titled "Embezzlement and Theft."[16] For instance, 18 U.S.C. § 659 provides: "Whoever embezzles, *steals*, or unlawfully takes, carries away, or conceals, or *by fraud or deception* obtains from any pipeline system, railroad car, wagon, motortruck, trailer, or other vehicle" commits a criminal offense.  Hay urges that Congress's use of the terms "steal" and "by fraud or deception" in § 659 shows that Congress did not intend the word "steal" to encompass fraud, or the language "by fraud or deception" would

---

[15] Section 641 provides in relevant part:

> Whoever *embezzles*, *steals*, *purloins*, or *knowingly converts* to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both. . . .

18 U.S.C. § 641 (emphasis added).

[16] *See, e.g.*, 18 U.S.C. § 659 ("embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains" certain goods or chattels); *id.* § 665(a) ("embezzles, willfully misapplies, steals, or obtains by fraud" certain property); *id.* § 666(a)(1)(A) ("embezzles, steals, obtains by fraud, or . . . converts" certain property); *id.* § 668(b)(1) ("steals or obtains by fraud from . . . a museum any object of cultural heritage"); *id.* § 668(b)(2) (prohibiting receiving an object of cultural heritage knowing that it "has been stolen or obtained by fraud"); *id.* § 670(a)(1) ("embezzles, steals, or by fraud or deception obtains, or knowingly and unlawfully takes, carries away, or conceals a pre-retail medical product").

be redundant.  Hay also argues that reading fraud into § 641 would require the Court to supply the element of materiality, and an absent element cannot be supplied by the courts and would violate his right to due process.

But, as the Government posits, the word "stealing" includes any acquisition of the property of another by false pretenses.  The definition of "steal" in *Black's Law Dictionary* supports this proposition: "1. To take (personal property) illegally with the intent to keep it unlawfully.  2.  To take (something) by larceny, embezzlement, *or false pretenses*."[17]  Indeed, since before § 641's enactment, the word "steal" has been defined as denoting the taking of personal property by "larceny, embezzlement, or *false pretenses*."[18]  Unlike larceny, stealing has "no common law definition to restrict its meaning as an offense [and] is commonly used to denote any dishonest transaction whereby one person obtains that which rightfully belongs to another."[19]

Given this common-law background, in *United States v. Morissette*, the Supreme Court recognized the breadth of § 641, noting that the statute was drafted "to collect from scattered sources crimes so kindred as to belong in one category": those that prohibit unlawful taking from the government.[20]  In describing the history of § 641, the Supreme Court concluded that the statute applied "to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their

---

[17] Black's Law Dictionary 1425 (11th ed. 2019) (emphasis added).

[18] *United States v. Turley*, 352 U.S. 407, 412 (1957) (emphasis added) (quoting Black's Law Dictionary (4th ed. 1951)); *see also Boone v. United States*, 235 F.2d 939, 940 (4th Cir. 1956) ("Black's Law Dictionary, 3d ed., gives 'steal' as denotive of a taking by false pretenses or by embezzlement or by larceny.").

[19] *Crabb v. Zerbst*, 99 F.2d 562, 565 (5th Cir. 1938).

[20] 342 U.S. 246, 266–67 (1952).

fixed definitions."[21]  And, unsurprisingly, circuit courts routinely affirm convictions for theft of government funds when those funds were obtained by fraud.[22]

This Court thus concludes that the scope of § 641 includes obtaining government funds by fraud, false representations, and false pretenses. And, a rational jury could find that the Government proved every element of § 641 beyond a reasonable doubt, as Hay obtained VA disability benefits by false pretenses, false representations, and by means of dishonest transactions.

## III.    Conclusion

Viewing the evidence in the light most favorable to the Government, a reasonable jury could find that the evidence proved beyond a reasonable doubt that Defendant Hay committed the crimes charged in Counts 1–16 of the Superseding Indictment.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Judgment of Acquittal (Doc. 99) is **denied**.

---

[21] *Id.* at 266 n.28.

[22] *See, e.g.*, *United States v. Dowl*, 619 F.3d 494, 501–02 (5th Cir. 2010) (concluding that a fraudulent scheme falls within the scope of § 641); *United States v. Herrera-Martinez*, 525 F.3d 60, 61–65 (1st Cir. 2008) (holding that § 641 applied to defendant charged with obtaining federal benefits under false pretenses); *United States v. Aguilar*, 967 F.2d 111, 114 (5th Cir. 1992) (noting the breadth of the term "steal" and holding that Congress intended for § 641 to include offenses like passing bad checks); *United States v. Crutchley*, 502 F.2d 1195, 1201 (3d Cir. 1974) (finding that § 641 applies to "larceny by trick"); *United States v. Dominguez*, 735 F. App'x 591, 594 (11th Cir. 2018) (finding a reasonable jury could convict the defendant for violating § 641 where she "made a knowing misrepresentation in an effort to receive workers' compensation benefits to which she was not entitled"); *see also* Model Crim. Jury Instr. 8th Cir. 6.18.641 cmt. (2021) ("In this statute, steal or stealing has been given broader meaning than larceny at common law. The statute applies to any taking whereby a person dishonestly obtains anything of value belonging to another with the intent to deprive the owner of the rights and benefits of ownership."); 1 Modern Fed. Jury Instr.—Crim. P23A.01 cmt ("Stealing includes obtaining property by misrepresentation.").

**IT IS SO ORDERED.**

Dated: December 2, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
